# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ROSEMARY BELL O/B/O,
D.B., a minor,
     Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:13-cv-870

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Rosemary Bell, on behalf of her grandson, D.B. (plaintiff), brings this action pursuant to

42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social

Security (Commissioner) denying plaintiff's application for Supplemental Security Income (SSI)

childhood disability benefits. This matter is before the Court on plaintiff's Statement of Errors

(Doc. 12) and the Commissioner's response in opposition (Doc. 17).

## I. Procedural Background

Plaintiff was born in May 2000 and was 12 years, 2 months old at the time of the

administrative law judge's (ALJ) decision. Plaintiff's grandmother, Rosemary Bell, filed an

application for SSI childhood benefits on his behalf in December 2009, alleging disability due to

attention deficit hyperactivity disorder (ADHD). (Tr. 208, 218). Plaintiff's application was

denied initially and upon reconsideration. Plaintiff requested and was granted a de novo hearing

before ALJ Dwight D. Wilkerson. Plaintiff and plaintiff's grandmother, represented by counsel,

appeared and testified on behalf of plaintiff at an ALJ hearing held on April 5, 2012. A second

ALJ hearing was held on July 20, 2012, at which plaintiff's grandmother and a medical expert,

Mary Buban, Psy.D., appeared and testified. On July 27, 2012, the ALJ issued a decision

denying plaintiff's SSI application. (Tr. 18-33). The Appeals Council denied plaintiff's request

for review, making the decision of the ALJ the final administrative decision of the

Commissioner. (Tr. 1-3).

## I. Analysis

### A. Legal Framework for Children's SSI Disability Determinations

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as

defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon

disability, income, and other financial resources. *Id.*; 20 C.F.R. § 416.202. An individual under

the age of 18 is considered disabled for purposes of SSI "if that individual has a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining

whether a child is disabled for purposes of children's SSI benefits:

1. Is the child is engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix 1 of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d). An impairment that meets or medically equals the severity of a set

of criteria for an impairment in the Listing, or that functionally equals a listed impairment,

causes marked and severe functional limitations. 20 C.F.R. § 416.924(d).

In determining whether a child's impairment(s) functionally equal the Listings, the

adjudicator must assess the child's functioning in six domains:

2

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Heath and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the Listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered in making this evaluation are (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) how the child is affected by his medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than extreme." (*Id.*). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id*.

If the child's impairment meets, medically equals, or functionally equals the Listings, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. 416.924(d)(2).

3

In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009). The "whole child" approach to functional equivalence requires the ALJ to consider the following questions:

1. How does the child function? "Functioning" refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments. We consider:

   • What activities the child is able to perform,

   • What activities the child is not able to perform,

   • Which of the child's activities are limited or restricted,

   • Where the child has difficulty with activities-at home, in childcare, at school, or in the community,

   • Whether the child has difficulty independently initiating, sustaining, or completing activities,

   • The kind of help, and how much help the child needs to do activities, and how often the child needs it, and

   • Whether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it.

2. Which domains are involved in performing the activities? We assign each activity to any and all of the domains involved in performing it. Many activities require more than one of the abilities described by the first five domains and may also be affected by problems that we evaluate in the sixth domain.

3. Could the child's medically determinable impairment(s) account for limitations in the child's activities? If it could, and there is no evidence to the contrary, we conclude that the impairment(s) causes the activity limitations we have identified in each domain.

4. To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain? We consider how well the child can initiate, sustain, and complete activities, including the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant to the determination of the degree of limitation.

4

*Id.* (internal citations omitted). Importantly, SSR 09-01p goes on to provide more detail about

the technique for determining functional equivalence but emphasizes:

> [W]e do not require our adjudicators to discuss all of [these] considerations [] in their determinations and decisions, only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings.

*Id.* at 3.

**B. The Administrative Law Judge's Findings**

The ALJ made the following findings of fact and conclusions of law:

1. [Plaintiff] was born [i]n May 2000. Therefore, he was a school-age child on November 23, 2009,[1] the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2. [Plaintiff] has not engaged in substantial gainful activity since November 23, 2009, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. [Plaintiff] has the following severe impairments: Attention Deficit Hyperactivity Disorder (ADHD), combined type, and oppositional defiant disorder (ODD) (Exhibit 12F) (20 CFR 416.924(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. [Plaintiff] does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. [Plaintiff] has not been disabled, as defined in the Social Security Act, since November 23, 2009, the date the application was filed (20 CFR 416.924(a)).

(Tr. 21-32).

In determining that plaintiff's impairments were not functionally equivalent to a listed

impairment, the ALJ found:

1. [Plaintiff] has less than marked limitation in acquiring and using information. (Tr. 26).

---

[1]The ALJ erroneously stated that plaintiff's disability application was filed on November 23, 2009. The record reflects that plaintiff's application for SSI benefits was filed on December 7, 2009. *See* Tr. 208.

5

2. [Plaintiff] has less than marked limitation in attending and completing tasks.  (Tr. 28).

3. [Plaintiff] has marked limitation in interacting and relating to others.  (Tr. 29).

4. [Plaintiff] has no limitation in moving about and manipulating objects.  (Tr. 31).

5. [Plaintiff] has no limitation in the ability to care for himself.  (Tr. 32).

6. [Plaintiff] has no limitation in health and physical well-being.  (Tr. 32).

**C.  Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination.  Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

6

the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

    **D. Specific Errors**

       Plaintiff asserts two errors on appeal. First, plaintiff contends the ALJ erred by giving

less than controlling weight to the opinions of plaintiff's treating psychiatrists and by relying on

the opinion of Dr. Buban, the non-examining medical expert, in assessing plaintiff's functional

limitations. Second, plaintiff asserts the ALJ erred by not properly considering statements from

his teachers and school psychologist. For the reasons that follow, the undersigned finds that the

ALJ's decision is substantially supported by the evidence of record and should be affirmed.

    1. <u>The ALJ did not err in weighing the medical source opinions of record.</u>

       Plaintiff asserts the ALJ erred by giving greater weight to the opinion of the non-

examining medical expert, Dr. Buban, than to the findings of his treating sources. Plaintiff's

treating psychiatrists, Daniel A. Vogel, M.D., and Loretta Sonnier, M.D., opined that plaintiff

had a marked to extreme limitation in maintaining concentration, persistence or pace. Plaintiff

contends the ALJ erred by relying on Dr. Buban's contrary conclusion that plaintiff's had a less

than marked limitation in attending and completing tasks. Plaintiff maintains his treating

sources' opinions should have been given controlling weight because they are consistent with

each other and with his teachers' reports. (Doc. 12 at 12-13).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical

8

specialty of the source, how well-supported by evidence the opinion is, how consistent the

opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544

(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).

Those reasons must be "supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-

2p, 1996 WL 374188 (1996)). This procedural requirement "ensures that the ALJ applies the

treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Gayheart*, 710 F.3d at 544 (quoting *Wilson*, 378 F.3d at 544).

The pertinent evidence is as follows.[2] Plaintiff treated with Dr. Vogel at the Children's

Home of Cincinnati from February 15, 2008 to April 30, 2010. *See* Tr. 437-52. *See also* Tr.

289-91. Dr. Vogel met with plaintiff on a monthly basis to review plaintiff's medication. *Id.*

On April 30, 2010, Dr. Vogel completed a Mental Impairment Questionnaire (RFC & Listings)

form. (Tr. 412-16). Dr. Vogel opined that plaintiff had mild to no restriction in activities of

---

[2]The record includes additional medical source opinion evidence from state agency reviewing psychologists Cynthia Waggoner, Psy.D. (Tr. 404-10) and Bruce Goldsmith, Ph.D. (Tr. 456-61) and consultative examining psychologist Norman L. Berg, Ph.D. (Tr. 396-403). Because plaintiff does not challenge the ALJ's findings regarding these opinions and for brevity's sake, the Court declines to summarize this evidence.

daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation. (Tr. 414). Dr. Vogel reported that plaintiff had a "low average, full scale IQ = 89" with similar subscores except that he had normal perceptual reasoning. (*Id.*). In support of his conclusions, Dr. Vogel noted that plaintiff continued to be impulsive and distractible on exam and plaintiff's teachers and therapist reported that he was inattentive during school and did not complete his school work. (Tr. 412). Dr. Vogel opined that plaintiff's future prognosis was fair depending on how he responds to medication adjustments but his prognosis for the remainder of the school year was "poor." (*Id.*).

On June 4, 2012, Dr. Buban completed medical interrogatories at the request of the ALJ. Dr. Buban opined that plaintiff had a less than marked limitation in the domains of acquiring and using information and attending and completing tasks, and less than marked to marked limitation in interacting and relating with others.[3] (Tr. 596). Regarding the domain of acquiring and using information, Dr. Buban supported her conclusion by reference to plaintiff's full scale IQ score of 89, which she stated demonstrated that plaintiff had "low average/average intellectual functioning" and noted that he was able to obtain average achievement scores despite sleeping in class and refusing to complete work. (*Id.*). Dr. Buban explained her opinion on plaintiff's ability to attend to and complete tasks by citing to plaintiff's inconsistency in completing school work, his average achievement scores, and evidence showing that his functional abilities improve

---

[3] Dr. Buban further opined that plaintiff had no limitation in the domains of moving about and manipulating objects, caring for himself, or in health and physical well-being. (Tr. 597).

10

with medication and appropriate sleep. (*Id*.). Regarding the domain of interacting and relating to others, Dr. Buban reported that plaintiff's behavior towards others was very erratic – at times he related to others positively but at other times he was "very reactive to teasing/bullying by other children and perceived rejection/correction by adults." (*Id*.). When asked to provide additional comments, Dr. Buban noted that plaintiff's "psychosocial environment is not providing consistent and appropriate care, medication management and behavior expectations." (Tr. 598).

Dr. Sonnier took over as plaintiff's treating psychiatrist at the Children's Home of Cincinnati in November 2011. On July 9, 2012, Dr. Sonnier completed a Mental Impairment Questionnaire (RFC & Listings) form. (Tr. 616-21). Dr. Sonnier opined that plaintiff had mild restriction in activities of daily living; marked difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation. (Tr. 619). Dr. Sonnier reported that plaintiff did not have a low IQ or reduced intellectual functioning, but that he was unable to interact appropriately with the public or work without being distracted. (*Id*.). When asked to describe the clinical findings supporting her assessment, Dr. Sonnier reported: "severe impairment of attention, highly distractible, constant fidgeting [and] movement, difficult to engage." (Tr. 616).

Dr. Buban testified as a medical expert at the July 2012 ALJ hearing. (Tr. 46-55). Dr. Buban stated she had reviewed Dr. Sonnier's recent opinion and treatment notes from the Children's Home of Cincinnati and that her opinion remained the same. (Tr. 46). She explained that Dr. Sonnier's form – a form used in assessing an adult's residual functional capacity (RFC)

11

– was difficult to rectify with plaintiff's functionality as a child. (Tr. 46-47). Dr. Buban noted that Dr. Sonnier opined that plaintiff had no useful functional ability to understand, remember, or carry out detailed instructions, but this was inconsistent with the testing evidence which demonstrated that plaintiff is of average intellectual ability and is capable of achieving average testing scores. (Tr. 47). Dr. Buban found that the new treatment notes were in line with what she had previously reviewed, such as psychosocial stressors, but that there seemed to be improvement in plaintiff's sleep. (Tr. 48). Dr. Buban testified that in her opinion, plaintiff had a marked limitation in the social interaction domain, but that was the only marked limitation she found. (Tr. 48-49). When questioned by plaintiff's counsel on the individualized education program (IEP) progress notes documenting plaintiff's inability to remain seated in class, failure to complete school work, and failing grades, Dr. Buban testified that despite these notes she did not find plaintiff to have a marked limitation in attending and completing tasks. (Tr. 50-51). In support, Dr. Buban cited to a February 6, 2012 progress note from Dr. Sonnier documenting problems with medication compliance but that plaintiff has been doing well at school and behaving at home. (Tr. 51, citing Tr. 480). Dr. Buban stated the record evidence includes instances of teachers reporting that plaintiff improves with medication and that the testing evidence shows he is learning even though he is not focusing all the time. (Tr. 51). Dr. Buban further testified that the crux of plaintiff's limitations stem from behavioral issues and his academic testing results did not support a finding of marked limitation in attending and completing tasks, especially given the instances of medication and behavioral noncompliance noted throughout the record. (Tr. 52-53). Dr. Buban noted that a child may present behavioral

12

problems in the classroom which cause difficulty for teachers, but those issues do not necessarily indicate an impairment in the ability to learn. (Tr. 54).

The ALJ concurred with Dr. Buban's opinions as laid out in her responses to medical interrogatories and hearing testimony and agreed with her conclusion that while plaintiff has serious challenges, many of his problems have more to do with his environment than his impairments. (Tr. 24). In contrast, the ALJ gave "little weight" to Dr. Vogel's opinion and "some weight" to Dr. Sonnier's. The ALJ found that Dr. Vogel's opinion that plaintiff had a marked impairment in maintaining concentration, persistence, or pace was internally inconsistent with his finding that plaintiff had significantly improved in the areas of acting impulsively and experiencing hyperactivity with current treatment and was not currently a problem. (Tr. 25, citing Tr. 414-16). The ALJ further explained that he was discounting Dr. Vogel's opinion because the doctor did not account for plaintiff's medication noncompliance in assessing his functional limitations. (Tr. 25). Regarding Dr. Sonnier's opinion, the ALJ echoed Dr. Buban's testimony that it was difficult to rectify Dr. Sonnier's conclusions with plaintiff's functionality because the doctor completed a form intended to assess an adult's functional abilities. (Tr. 24). The ALJ also noted that Dr. Sonnier's opinion that plaintiff has an extreme limitation in maintaining concentration, persistence or pace is inconsistent with the Global Assessment of Functioning (GAF)[4] score of 55 she assigned to plaintiff. (Tr. 24, citing Tr. 616).

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with

13

The ALJ's determination in weighing the medical opinion evidence is supported by substantial evidence. The ALJ gave "good reasons" for discounting the Drs. Vogel and Sonnier's opinions. As noted by the ALJ, Dr. Vogel's conclusion that plaintiff had a marked limitation in maintaining concentration, persistence, or pace is inconsistent with his finding that plaintiff had significantly improved with his current treatment and that there was no current problem with plaintiff acting impulsively or experiencing hyperactivity. *See* Tr. 414-16. *See also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440-42 (6th Cir. 2010) (internal inconsistencies in a treating physician's opinion "provide substantial evidentiary support for [an] ALJ's decision [to not] accord it controlling weight."). It was also reasonable for the ALJ to give reduced weight to Dr. Vogel's opinion given the doctor's failure to address the issue of medication noncompliance. Though Dr. Vogel's treatment notes reflect that plaintiff was compliant with medication, *see* Tr. 437-50, the progress notes from the Children's Home of Cincinnati document repeated instances where plaintiff's behavioral and attentiveness issues are impacted by whether he takes his medication. *See, e.g.*, Tr. 480 (in February 2012, Dr. Sonnier advised plaintiff's grandmother to make sure that plaintiff takes his medications as directed at school after learning from a nurse that plaintiff had not been taking his medication as directed); Tr. 481 (on January 31, 2012, plaintiff was engaged in therapy and insightful about his behaviors and stated that he knew "today was going to be a day without trouble because he took his

---

clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51 to 60 as having "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning. . . ." *See* DSM-IV at 34.

medication"); Tr. 485 (Dr. Sonnier noted on December 5, 2011, that she had heard reports from

plaintiff's school that medication was helping); Tr. 491 (on September 14, 2011, plaintiff's

therapist reported that plaintiff had not taken his medication and was not engaging in school

activities); Tr. 512-14, 516 (plaintiff refused to take his medication because he had taken it at

home and refused to engage in statewide testing but, after being bribed, took his medication and

underwent testing which he reported was not hard); Tr. 552 (on December 7, 2010, plaintiff's

therapist reported that she and plaintiff were stopped on the way to therapy by one of plaintiff's

teachers who praised his progress in class and plaintiff talked about his school and home

improvement "due to new med compliance"); Tr. 553 (in November 2010, plaintiff discussed the

benefits of taking his medication including staying awake in class, not getting into trouble, and

completing his work); Tr. 556 (on November 17, 2010, plaintiff's therapist noted that she had

received collateral information from plaintiff's teacher regarding his medication compliance and

associated positive changes); Tr. 560 (on November 15, 2010, plaintiff and his therapist talked

about plaintiff's non-compliance with medication after plaintiff performed appropriately for the

first time in months after taking his medication); Tr. 571 (plaintiff reported on September 28,

2010, that he had not taken his medication that morning and said that was why he wasn't doing

any work in class). *See also* Tr. 233-40 (in February 2010, plaintiff's fourth-grade teacher

completed a reported that when plaintiff is present at school and not sleeping he attempts to work

independently and he is able to focus when he takes his medication). It is unclear from review of

Dr. Vogel's notes whether or not medication compliance was considered by the doctor, but the

progress notes from the Children's Home of Cincinnati establish that plaintiff performs and

15

behaves differently when he takes his medication as prescribed. Accordingly, it was reasonable for the ALJ to discount Dr. Vogel's opinion for failure to address this relevant issue and its effect on plaintiff's functional limitations. *See* 20 C.F.R. 416.927(c)(6) ("when considering how much weight to give a medical opinion . . . [the ALJ may consider] the extent to which the an acceptable medical source is familiar with the other information in your case record. . . .").

The ALJ's decision to give "some weight" to Dr. Sonnier's opinion and conclusions is likewise substantially supported by the evidence of record. The ALJ noted that while Dr. Sonnier acknowledged that plaintiff had issues with medication compliance, her opinion was hard to equate to children as the doctor used a questionnaire form meant for adults. (Tr. 24, citing Tr. 616-21). The ALJ's conclusion is substantially supported by Dr. Buban's hearing testimony. *See* Tr. 46-47 (Dr. Buban testified that it was hard for her to rectify Dr. Sonnier's check-marked conclusion that plaintiff had no useful ability to function to understand, remember, and carry out detailed instructions (Tr. 618) with the evidence of record which portrayed a child of average intellectual ability with the ability to achieve average academic scores). Moreover, the ALJ's decision to discount Dr. Sonnier's opinion on the basis of internal inconsistency is substantially supported as the doctor assigned plaintiff a GAF score of 55, which describes an individual with moderate difficulty in social and school functioning, but opined that plaintiff has marked limitations in social functioning and extreme limitation in maintaining concentration, persistence, or pace. *See* Tr. 616, 619. *See also Coldiron*, 391 F. App'x at 440-42. Given this internal inconsistency and the issues identified by the ALJ regarding translating the findings

16

from an adult-oriented impairment questionnaire to real-world limitations for a child, the ALJ

reasonably concluded that Dr. Sonnier's opinion was due only "some weight."

Lastly, the ALJ's decision to adopt the conclusions set forth by Dr. Buban is supported

by substantial evidence. Dr. Buban was able to review all of the evidence of record before

rendering an opinion, including the opinion of Dr. Sonnier submitted after Dr. Buban had

completed her interrogatory responses. *See Blakley*, 581 F.3d at 408-09 (a medical expert's

opinion, based on a review of all evidence of record, may constitute substantial evidence).  Dr.

Buban cited to specific evidence in support of her conclusion that plaintiff's limitation in

attending and completing tasks was less than marked.  Dr. Buban noted that plaintiff's attention

improved with medication, but there was evidence of noncompliance and inconsistency on the

part of plaintiff's grandmother, his caregiver.  *See* Tr. 593.  At the ALJ hearing, Dr. Buban

testified that the focus of plaintiff's treatment related to his emotional responses to significant

existing psycho-social stressors, including custody issues.  (Tr. 47).  Dr. Buban also cited to

plaintiff's improvement in attending and completing tasks when he was compliant with

medication and had appropriate sleep hygiene and expectations.  *See* Tr. 47, 596.  Dr. Buban

testified that the form completed by Dr. Sonnier was difficult to translate to plaintiff's limitations

as a child because the form is intended to assess an adult's ability to do work-related activities

and not the six functional domains used to evaluate children.  (Tr. 46-47).  Dr. Buban further

testified that the testing evidence of record established that plaintiff was of average intelligence

and was able to achieve average academic scores.  (Tr. 47).  Dr. Buban explained that plaintiff's

ability to achieve average scores on standardized academic testing demonstrates that he was

doing more than just sitting in class, he was learning, which is inconsistent with an extreme or marked limitation in attending or completing tasks. (Tr. 47, 53-54). *See also* Tr. 298-99 (plaintiff's scores on intelligence and academic achievement testing results from April 2010 largely fell in the low average to average range). She further testified that the academic records showed that at times plaintiff was completing work and that his teacher's reported improvement with medication compliance. (Tr. 51). Plaintiff's education records and the therapy progress notes cited above support Dr. Buban's interpretation of the evidence. In consideration of the evidence supporting Dr. Buban's opinions and her well-reasoned explanations, it was reasonable for the ALJ to rely on her testimony and responses to medical interrogatories in finding that plaintiff's limitation in attending and completing tasks was less than marked.

For these reasons, plaintiff's first assignment of error should be overruled.

2. The ALJ appropriately considered the evidence from plaintiff's teachers and school psychologist.

For his second assignment of error, plaintiff asserts the ALJ erred by failing to give proper weight to reports from his teachers and school psychologist that plaintiff has marked or extreme impairments in social functioning and in maintaining concentration, persistence or pace. Plaintiff's argument consists of two paragraphs which are largely recitations of standards of law except for the following: "Almost all of [plaintiff]'s teachers and school psychol[o]gists stated that [plaintiff] had marked or extreme impairments in social functioning, and maintaining concentration, persistence or pace. . . . The [ALJ] failed to give the proper weight and credibility to the teachers and school psychologist statements and thereby erred." (Doc. 12 at 13-14).

18

Plaintiff does not identify the evidence he claims should have been given greater weight or explain how this evidence establishes that he has greater limitations than those found by the ALJ.[5]   Plaintiff's failure to present a developed argument regarding the ALJ's alleged failure to properly consider the evidence from his teachers and school psychologist amounts to a waiver. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  The Court is therefore unable to conclude that the ALJ erred as plaintiff contends. Accordingly, plaintiff's second assignment of error is not well-taken and should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: _12/2/14_

Karen L. Litkovitz
United States Magistrate Judge

---

[5]Notably, though plaintiff argues the ALJ erred by not crediting statements regarding his social functioning limitation, the ALJ found that plaintiff had a marked limitation in interacting and relating to others. *See* Tr. 29-30.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ROSEMARY BELL O/B/O,
D.B., a minor,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:13-cv-870

Barrett, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).